PATRICIA HALL, Ex'r of the Estate of Vera J. Martin and Adm'r of the Estate of Richard B. Martin, Deceased, Plaintiff-Appellant, v. J. F. MARTIN CARTAGE COMPANY *et al.*, Defendants-Appellees.

First District (5th Division)   No. 86—2769

Opinion filed December 4, 1987.

Kenneth H. Brown, of Highland Park, for appellant.

James A. Campion and Angela Kline, both of Holmstrom & Green, P.C., of Woodstock, for appellees.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Plaintiff, Patricia Hall, as administrator of the estate of Richard B. Martin, her father, and executor of the estate of Vera J. Martin, her mother, brought a declaratory judgment action against defendants J. F. Martin Cartage Company and Neil C. Martin to determine whether a stock purchase agreement between Richard B. Martin and the J. F. Martin Cartage Company terminated prior to decedent's death. The circuit court found that the agreement was valid and enforceable and entered judgment in favor of defendants at the close of plaintiff's case. Plaintiff appeals.

The J. F. Martin Cartage Company (the Corporation) was begun in 1901, was incorporated in 1915 and has operated under its present name since 1928. J. F. Martin was the father of Richard B. Martin (decedent) and his brother, J. F. Martin, Jr., who worked for the Corporation for most of their lives. Defendant Neil C. Martin (president) is the son of J. F. Martin, Jr., and has been president of the corporation since 1965. After the death of his father in 1974, the president controlled 816 shares, which is 51% of the Corporation's stock; decedent owned 784 shares, or 49% of the stock.

On July 15, 1974, decedent and the Corporation entered into a stock purchase agreement whereby the Corporation was given the right to redeem stock owned by decedent at the time of his death. The agreement fixed the redemption price as the book value per share as reflected in the books of account of the Corporation as of the last day of the month immediately preceding the date of the stockholder's death. Paragraph 9 of the stock purchase agreement provided:

"This Agreement shall terminate upon the occurrence of any of the following events:

A. Cessation of the Corporation's business;

B. Liquidation and dissolution of the Corporation;

C. Bankruptcy or insolvency of the Corporation or the appointment of a receiver of the assets of the Corporation if said appointment is not vacated within sixty (60) days after same becomes effective."

Decedent devised the stock purchase agreement to protect the Corporation from outside control and to insure its continuance after his death. The preamble expressed the parties', belief that it was in the best interests of the Corporation that decedent's stock be acquired by the Corporation at his death and not fall into the hands of persons whose interests might be antagonistic to those of the Corporation. The president had no role in the negotiation or preparation of the stock purchase agreement and never, discussed the specific terms of the agreement with decedent after it was executed.

Under its original charter, the Corporation was formed "to engage in the General Teaming and Automobile Trucking business, including the maintenance and operation of a storage warehouse for general merchandise in the City of Chicago and elsewhere," and "to engage in the business of keeping a livery and boarding stable." On September 30, 1940, the articles of incorporation were amended to include as corporate objects "the power of acquiring, owning, using, conveying and otherwise disposing of and dealing in real property or any interest therein."

At the time the stock purchase agreement was executed in 1974, the Corporation's principal business activity was transportation services—piggyback, consolidation, dock handling, industrial moving, equipment leasing and consulting. The Corporation also leased office and yard space at its terminal in Hodgkins, Illinois, to some of its customers. In 1973, the Corporation acquired three acres of land adjacent to its facility for speculation, or possible expansion. Other than the Hodgkins facility and the three-acre parcel, the Corporation has not owned any other property since 1974.

Because of a tremendous increase in operating costs, the Corporation had net operating losses of approximately $140,000 in 1977 and $160,000 in 1978. The Corporation tried to cut its losses by reducing its payroll and other costs, eliminating marginal customers, attempting to renegotiate the union contract, lowering its insurance premiums and servicing only profitable accounts. In 1978, the Corporation began looking for a buyer for its Hodgkins facility.

Although the president wanted to sell the property for cash, dissolve the corporation, dismiss decedent from his employment and pay

him for his shares of stock, that disposition was neither possible nor practical. The president was advised by an accountant that there were significant tax advantages in not dissolving the Corporation because the accumulated losses from prior years would shelter the capital gain derived from the sale of the property. To avoid being taxed as a personal holding company, however, the Corporation would have to engage in some business activity.

On December 31, 1979, the Corporation entered into a 15-year installment contract to sell the facility, together with the adjoining three-acre parcel of land, to Chief Freight Lines. The total sales price was $1,200,000, with a down payment of $100,000 and the balance to be paid over 15 years at the rate of $12,502.57 per month, including interest. Under the terms of the contract, the Corporation reserved the right to continue its business operations at the Hodgkins facility.

The sale was approved at a special meeting of the Corporation's shareholders and directors in October 1979 at which the president's wife, Sheila Martin, was elected as a third director to fill a vacancy and provide the president with a director who would support his decisions. Decedent agreed to the sale of the facility only after he had been assured that he would continue to be employed by the Corporation and had been given a memorandum confirming the Corporation's intent to negotiate a formal employment contract with him. Although no such contract was ever finalized, decedent continued as a salaried employee of the Corporation from October 23, 1979, when he signed an agreement to execute the shareholders' and directors' minutes authorizing the sale of the property, until his death in April 1983. The Corporation also provided decedent with health insurance and a company car, even though he had been semi-retired since 1967.

Except for the occasional leasing of its certificate of authority, the Corporation ceased all transportation-related activities by the end of 1980. The Corporation sold all of its trucks, equipment, office furniture and tangible assets, cancelled its telephone number and insurance coverage and laid off all of its employees except decedent, the president, a part-time employee who left in 1982 and a part-time bookkeeper.

Decedent had no assigned duties but was authorized by the president to approve the sale of the few pieces of scrap equipment remaining on the premises and to inspect the property in his absence. The president described these activities as "nominal," and stated that they required very little of decedent's time. The president, who worked for the Corporation on a part-time basis, handled the shutdown of the cartage operations, supervised the collection of accounts receivable,

paid the mortgages on the property and attempted to locate tenants for Chief Freight Lines. After a death in the president's immediate family, decedent saw that the accounts receivable were collected, that the building was properly maintained and that the payments were made by the lessee of the Corporation's certificate of authority.

In 1982, the Corporation leased office space at the Hodgkins facility to Trans Rail Corporation, a company controlled by the president. Only part of the rent due under the lease was paid. By April 1983, when decedent died, Chief Freight Lines was in bankruptcy and had been in default under its installment payments to the Corporation on its long-term real estate contract. As a result of Chief Freight Lines' filing for bankruptcy, Woolcon, another company started by the president, had to loan $60,000 to the Corporation so that the mortgages on the property could be paid. The Corporation managed the property and continued to find tenants for Chief Freight Lines to enable them to make payments on the installment contract. In March 1983, the president wrote a letter to attorneys involved in the bankruptcy proceedings in which he stated that the Corporation was "totally dependant on Chief Freight Lines for survival."

The Corporation has continued to hold directors' and shareholders' meetings, to pay the franchise tax and to file annual reports and income tax returns. The Corporation had an average annual gross income in excess of $220,000 for each year from 1980 to 1984.

The president testified that on several occasions between 1979 and 1983, decedent asked him to take care of his wife, Vera Martin, after his death. Sheila Martin testified that at various times from 1979 on, decedent expressed the desire that the Corporation continue to operate and take care of his family. He wanted the business to remain in the family and did not want "an outsider to come into the picture and disrupt things or create problems for the company." According to Ms. Martin, decedent told the president that he had "taken care of his end, that there would be nobody interfering from his side" and asked him not to "let anybody interfere from your side."

Shortly before his death in April 1983, decedent warned the president that his daughter (plaintiff herein) was considering remarrying and that he wanted his stock in the Corporation to be kept where the president could handle it. Sheila Martin explained that decedent had expressed concern that his daughter's future husband might be able "to step into the picture and act in a manner that wouldn't benefit the corporation." After the sale of the Hodgkins facility to Chief Freight Lines in 1979, decedent often went to the office and said, "Well, I see we are still in business." Decedent appeared to be happy

that the Corporation was still functioning.

One week after decedent's death, the president and the other surviving director (his wife, Sheila Martin) visited Vera Martin and assured her that everything would remain the same. She would continue to receive the $1,500 per month that decedent had been paid, she would have the use of the company car and she would be covered by health insurance.

In June 1983, Sheila Martin found the stock purchase agreement among some papers in her home. The president and his wife met with an accountant, who warned them that there could be adverse tax consequences to the Corporation and Vera Martin because she was receiving a salary but was not performing any services. The accountant estimated that decedent's stock in the Corporation was worth approximately $24,500 in accordance with the formula set forth in the agreement, a value which surprised the president. After consulting with the accountant, the president decided to invoke the provisions of the stock purchase agreement to protect the Corporation against outside control, to set a value on decedent's stock and as a method of paying additional compensation to Vera Martin without jeopardizing her government benefits.

Following the meeting with the accountant, the president informed Vera Martin that the Corporation had devised a means of paying her $1,500 per month and that she would receive the payments pursuant to the stock purchase agreement. She was not told, however, that the payments would constitute full payment for decedent's interest in the Corporation. Vera Martin never turned over decedent's stock to the Corporation or cashed any of the checks issued pursuant to the stock purchase agreement.

In July and September 1983, the president wrote letters to Chief Freight Lines requesting further payments on the installment contract. He represented that the minority share in the Corporation owned by decedent was the only asset in his uncle's estate and stated that he had a duty to protect his aunt's interests.[1] Vera Martin died in November 1983.

Plaintiff contends that the trial court erred in finding that the stock purchase agreement was valid and enforceable and in entering judgment for defendants at the close of her case. We disagree.

---

[1]Although there is no testimony on the matter, the parties appear to agree that the installment contract with Chief Freight Lines was terminated for nonpayment of the mortgage and that the property was resold by the Corporation to another company for $900,000 on a long-term financing basis.

Subparagraph 9(A) provided that the agreement would terminate upon "Cessation of the Corporation's business." Plaintiff argues that this language is clear and unambiguous, and refers to the business that the Corporation engaged in at the time the agreement was executed, *i.e.*, the transportation business.

We believe that this construction is untenable for several reasons: First, it reads into the stock purchase agreement a limitation which simply does not appear anywhere in the document itself. (*Coney v. Rockford Life Insurance Co.* (1966), 67 Ill. App. 2d 395, 399, 214 N.E.2d 1.) Second, it ignores the possibility that the Corporation would abandon the transportation business but would pursue some other, more profitable business. Third, it cannot be harmonized with the language of subparagraphs 9(B) and 9(C), which contemplate events terminating the existence of the Corporation.

Paragraph 9 of the stock purchase agreement specified three events which would terminate the agreement: cessation of the Corporation's business; liquidation and dissolution of the Corporation; or bankruptcy or insolvency of the Corporation. Each represents a distinct manner in which the Corporation would cease to function. (Ill. Rev. Stat. 1985, ch. 32, pars. 3.10(n), 12.10, 12.35, 12.50.) Plaintiff's interpretation of subparagraph 9(A) would destroy this symmetry. See *McDonald's Corp. v. Mazur* (1984), 127 Ill. App. 3d 608, 613 (contract must be read as a whole and all parts construed together).

In the absence of any special meaning the parties attached to the term, we believe that "business," as used in the stock purchase agreement, may be defined as any "commercial activity engaged in for gain or livelihood." (Black's Law Dictionary 179 (5th ed. 1979).) Thus, the question becomes whether the Corporation was engaged in any such activity at the time of decedent's death.

Although the Corporation entered into a long-term installment contract to sell the Hodgkins facility and the adjoining three-acre parcel of land to Chief Freight Lines in 1979 and ceased virtually all transportation related activities by the end of 1980, it continued to rent out office space at the terminal under a reservation contained in the installment contract, occasionally leased its certificate of authority to other freight companies and incurred new debt to finance mortgage payments on the property.

To shelter the capital gain derived from the sale of the property and to avoid being taxed as a personal holding company, the Corporation had to remain in existence and engage in some business activity. In addition to the activities mentioned above, the Corporation managed the property and found tenants for Chief Freight Lines.

The installment contract clearly anticipated the continued existence of the Corporation for 15 years. The Corporation had an average annual gross income in excess of $220,000 for each year from 1980 to 1984.

This evidence certainly suggests that the Corporation was engaged in commercial activity for livelihood or gain. That suggestion is confirmed when we consider decedent's own statements and conduct. Decedent agreed to the sale of the property in October 1979 only after he had been assured that he would continue to be employed by the Corporation. He remained as a salaried employee until his death in April 1983 and was provided with health insurance and a company car. Decedent filled in for the president when necessary and saw that the accounts receivable were collected, that the building was properly maintained and that the payments were made by the lessee of the Corporation's certificate of authority.

After the property was sold, decedent repeatedly expressed his desire that the Corporation continue to operate, that his stock be kept where the president could handle it and that the business remain in the family, secure from outside control. Between 1979 and 1983, decedent often came into the office and said, "Well, I see we are still in business."

Based on the foregoing, we agree with the trial court that decedent "did not act [as if] or believe that there was a cessation of the J. F. Martin Company business or that it was about to be closed or [go] out of business." This conclusion is not affected by decedent's natural and understandable concern for his wife's financial support after his death. In light of the formula used in the stock purchase agreement for computing the value of his stock in the Corporation, decedent may have believed that his wife would need additional income on which to live.

Although plaintiff argues that defendants' actions after decedent's death reflect their belief that the agreement was no longer operative, we do not share her interpretation of those actions. Moreover, we agree with the trial court that events after decedent's death are not relevant in determining whether the Corporation had ceased its business operations before his death.

We have examined the authorities cited by plaintiff in support of her argument that the Corporation had ceased its business operations and find the facts in those cases to be distinguishable from those present here.

Upon our review of the evidence, we believe that the trial court properly found the stock purchase agreement to be valid and enforce-

718

able and entered judgment for defendants at the close of plaintiff's case. Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

LORENZ and MURRAY, JJ., concur.